# United States Court of Appeals

### For the Eighth Circuit

_____

No. 17-1931

_____

Jessica Parm, on behalf of herself and all others similarly situated

*Plaintiff - Appellee*

v.

Bluestem Brands, Inc.

*Defendant - Appellant*

_____

No. 17-1932

_____

Sara Arce; Anne Bowers; Nena Osorio, on behalf of themselves and all others similarly situated

*Plaintiffs - Appellees*

v.

Bluestem Brands, Inc.

*Defendant - Appellant*

_____

Appeals from United States District Court
for the District of Minnesota - Minneapolis

_____

Submitted: May 17, 2018
Filed: August 7, 2018

_____

Before SHEPHERD, KELLY, and GRASZ, Circuit Judges.

_____

SHEPHERD, Circuit Judge.

Jessica Parm, Sarah Arce, Anne Bowers, and Nena Osorio represent a class of people who purchased goods from Bluestem Brands, Inc. ("Bluestem") and were extended a line of credit in order to make those purchases. As part of the financing application, each plaintiff agreed to arbitrate any dispute "arising from or relating to the credit offered or provided to" them. After discovering that Bluestem allegedly engaged in unscrupulous business practices, the plaintiffs brought these class action suits against Bluestem, asserting a number of claims under federal and state laws. The cases were consolidated, and Bluestem moved to compel arbitration. The district court granted the motion in part and denied it in part. Bluestem appeals, arguing that all of the plaintiffs' claims fall within the scope of the arbitration clauses. We agree and therefore reverse the district court and order arbitration of all plaintiffs' claims.

I.

Bluestem sells consumer goods via traditional mail and telephone orders or online using two websites, Fingerhut and Gettington. Despite a remarkably similar appearance between the websites, they differ in two significant ways: First, the price of an item offered on Fingerhut is generally higher than the price of that same item on Gettington. Second, the primary price for an item on the Fingerhut website is

displayed in terms of a monthly payment, whereas the price displayed on the Gettington website is a single, lump-sum amount.[1]

Bluestem partners with independent financial institutions to provide credit lines to consumers for purchases made from Fingerhut. That partner was MetaBank prior to July 2012 and WebBank thereafter. These financing options were displayed on the Fingerhut website and in printed advertisements, and customers were able to apply online or over the phone. During the application process, all consumers agreed to one of two arbitration clauses relevant to the present case. The 2010 credit agreement—applicable to Parm, Bowers, and the class members they represent—states as follows:

> [I]f a dispute of any kind arises out of this Agreement, either you or we, at our sole discretion, can choose to have that dispute resolved by binding arbitration. . . . Any claim, dispute or controversy, (whether in contract, regulatory, tort or otherwise, whether pre-existing, present or future and including constitutional, statutory, common law, intentional tort and equitable claims) arising from or relating to the credit offered or provided to you; the actions of yourself, us or third parties; or the validity of this Arbitration provision (individually and collectively, a "Claim"), must, after an election by you or us, be resolved by binding arbitration.

The 2013 and 2014 Agreements—applicable to Arce, Osorio, and the class members they represent—reads:

> [E]ither you or we, at our sole discretion, can choose to have any dispute arising out of or relating to this Agreement or our relationship resolved by binding arbitration.
> . . . .

---

[1]Fingerhut also lists a lump-sum price, but it is in a lighter-colored and smaller-sized font just above the monthly payment.

For purposes of this Arbitration provision, "dispute" shall be construed as broadly as possible, and shall include any claim, dispute or controversy (whether in contract, regulatory, tort or otherwise, whether preexisting, present or future and including constitutional, statutory, common law, intentional tort and equitable claims) arising from or relating to this Agreement, the credit offered or provided to you, or the goods or services you purchase; the actions of yourself, us, or third parties; or the validity of this Agreement or this Arbitration provision. It includes disputes brought as counterclaims, cross claims, or third party claims.

The agreements further state that the contracting party would be bound by the terms contained therein from the time he or she first used the credit. Each of the plaintiffs was approved for a line of credit with one of the banks and proceeded to use that financing to purchase goods via Fingerhut.

The plaintiffs brought these actions,[2] alleging that Bluestem engaged in a targeted advertising campaign, whereby it directed people with lower income and credit scores to Fingerhut and people with higher income and credit scores to Gettington. The plaintiffs further alleged that Bluestem imposed hidden finance charges that exceed maximum statutory limits in a manner violative of a number of state and federal usury, contract, truth-in-lending, and deceptive marketing laws. Bluestem moved to compel arbitration under the agreements the plaintiffs signed, and the district court granted this motion in part, thereby compelling arbitration of only a subset of the claims.

---

[2]Parm filed her class action complaint in the United States District Court for the District of Minnesota. Arce, Bowers, and Osorio filed their complaint in the Central District of California. The two actions were later consolidated in the District of Minnesota. As will be discussed further later in this opinion, the substance of the two complaints is identical in all material respects.

As is relevant to this appeal, the court found that three groups of claims fall outside the scope of the respective credit agreements and thus are not subject to arbitration. First, it found that the state usury counts survive Bluestem's motion "to the extent . . . [they] allege that the hidden finance charges violate state law regardless of the interest rates charged under the credit agreements." Second, to the extent that the plaintiffs' state and federal counts allege that "Bluestem should have disclosed that the prices included hidden finance charges," the court concluded that "these claims do not relate to the revolving credit accounts in any way." Finally, it held that "to the extent that Plaintiffs claim unjust enrichment solely in relation to Bluestem's sale of goods and pricing for those goods—as opposed to the Banks' provision of credit through the revolving credit accounts—these claims do not arise out of or relate to the credit agreements or the Plaintiffs' relationship with the Banks." Bluestem appeals.

## II.

Bluestem contends that the district court erred in its determination that the plaintiffs' state-law usury counts, state and federal financial-disclosure counts, and state-law unjust enrichment counts were not arbitrable. We review this challenge de novo. Cicle v. Chase Bank USA, 583 F.3d 549, 553 (8th Cir. 2009). There is no challenge to Bluestem's ability to enforce the agreements, nor do the appellees contend that the agreements themselves are invalid.

Two questions are pertinent when reviewing an order denying a motion to compel arbitration: (1) whether the parties entered a valid arbitration agreement, and, (2) if so, whether the parties' particular "dispute falls within the scope of the arbitration agreement." Unison Co. v. Juhl Energy Dev., Inc., 789 F.3d 816, 818 (8th Cir. 2015) (emphasis omitted). "[S]tate contract law governs the threshold question of whether an enforceable arbitration agreement exists between litigants; if an enforceable agreement exists, the federal substantive law of arbitrability governs

whether the litigants' dispute falls within the scope of the arbitration agreement." Donaldson Co. v. Burroughs Diesel, Inc., 581 F.3d 726, 731 (8th Cir. 2009). Given the appellees' concession that there is a valid arbitration agreement,[3] we are concerned only with whether the current dispute falls within the agreements' scope.

It is a "fundamental principle that arbitration is a matter of contract." AT&T Mobility LLC v. Concepcion, 563 U.S. 333, 339 (2011) (internal quotation marks omitted). Accordingly, "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 83 (2002). But where a valid arbitration agreement exists, "[w]e must liberally construe" it, "resolving any doubts in favor of arbitration . . . unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." Unison Co., 789 F.3d at 818 (second alteration in original) (internal quotation marks omitted). The specific inquiry before us, then, is whether the arbitration clauses are susceptible to an interpretation that covers the three subsets of claims the district court exempted from arbitration. Cf. id.; see also AT&T Techs., Inc. v. Commc'ns Workers of Am., 475 U.S. 643, 650 (1986) ("[A]n order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage." (internal quotation marks omitted)).

In resolving this issue, the first question is "whether the arbitration clause is broad or narrow." Unison Co., 789 F.3d at 818 (quoting Fleet Tire Serv. of N. Little

---

[3]There is a live dispute over *which* agreement controls the various parties, but no one argues about *whether* an agreement exists in the first place. Because of the broad nature of the provisions contained in both agreements, we do not find it necessary to determine which agreement controls which party. Instead, we choose to decide the issues based on appellees' concessions that Parm and Bowers are bound by the 2010 Agreement and Arce and Osorio are bound by the 2013/2014 Agreement.

Rock v. Oliver Rubber Co., 118 F.3d 619, 621 (8th Cir. 1997)). "If the clause is broad, the liberal federal policy favoring arbitration agreements requires that a district court send a claim to arbitration . . . as long as the underlying factual allegations simply touch matters covered by the arbitration provision." Id. (second alteration in original) (internal quotation marks omitted); see also United Steelworkers of Am. v. Duluth Clinic, Ltd., 413 F.3d 786, 789 (8th Cir. 2005) ("[I]f the clause is broad . . . the court analyze[s] whether the dispute relates to the subject matter of the agreement.").

Bluestem asserts that the clauses in both agreements are broad, but the appellees' position is less clear. The appellees seem to concede that the clauses are broad in multiple places in their brief. See Appellees' Br. 34 ("The 2010 and 2014 credit agreements provide that disputes 'arising from' or 'relating to' the credit agreements must be arbitrated . . . , and while these phrases '[are] broad,' they '[are] not all encompassing.'" (quoting Doe v. Princess Cruise Lines, Ltd., 657 F.3d 1204, 1218 (11th Cir. 2011)); Appellees' Br. 44 (same); Appellees' Br. 45 ("Simply waiving around a broadly drafted arbitration agreement is not enough . . . ."). But they nonetheless persist that "the language about claims 'arising from or relating to the credit offered or provided to you' . . . serve[s] to limit the nature of claims . . . that are subject to arbitration." Appellees' Br. 38. We first determine the breadth of the arbitration clauses—that is, whether they are broad or narrow—and we then apply the appropriate standard to determine whether the current dispute falls within the scope of the clauses. See, e.g., Unison Co., 789 F.3d at 818.

A.

"Arbitration clauses covering claims 'arising out of' or 'relating to' an agreement are broad." Zetor N. Am., Inc. v. Rozeboom, 861 F.3d 807, 810 (8th Cir. 2017). Indeed, "[s]uch a provision constitutes the broadest language the parties could reasonably use to subject their disputes to that form of settlement, including collateral

disputes that relate to the agreement containing the clause." Fleet Tire, 118 F.3d at 621. In the years since we adopted the broad/narrow approach in Fleet Tire, we have applied its reasoning steadfastly so long as there was not limiting language elsewhere in the contract.[4]

From this precedent, we have little trouble concluding both Agreements contain "broad" arbitration clauses. See, e.g., Rozeboom, 861 F.3d at 810. Specifically, the 2010 agreement states that "if a dispute of any kind *arises out of this Agreement*, either you or we, at our sole discretion, can choose to have that dispute resolved by binding arbitration." R. at 154 (emphasis added); see Leonard, 861 F.3d at 730 ("The language 'any dispute arising from the Activity' is broad."). It continues: "Any claim, dispute or controversy . . . *arising from or relating to* the credit offered or provided to you . . . must, after an election by you or us, be resolved by binding arbitration." R. at 154 (emphasis added); see Grizzle, 424 F.3d at 800 (finding clause broad where it covered "any claim, controversy or dispute arising out of or relating to Franchisee's operation of the Franchised business under the Agreement"). The 2013/2014 agreement—which contains even broader language—states that "either you or we, at our sole discretion, can choose to have any dispute *arising out of or relating to this Agreement* or our relationship resolved by binding arbitration," and it further clarifies that "'*dispute' shall be construed as*

---

[4]See Leonard v. Del. N. Companies Sport Serv., Inc., 861 F.3d 727, 730 (8th Cir. 2017); Unison Co., 789 F.3d at 818-19; PRM Energy Sys., Inc. v. Primenergy, LLC, 592 F.3d 830, 836 (8th Cir. 2010) (finding clause broad where it covered "'all disputes arising under' the agreement"); 3M Co. v. Amtex Sec., Inc., 542 F.3d 1193, 1199 (8th Cir. 2008) ("While the clause is not as extensive as clauses which require arbitration of 'any' or 'all' disputes, the parties' definitions of terms . . . indicate that they agreed to arbitrate a very broad range of disputes . . . ."); CD Partners, LLC v. Grizzle, 424 F.3d 795, 800 (8th Cir. 2005); cf. Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 5 (1983) (classifying as "broad" a clause which covered "[a]ll claims, disputes and other matters in question arising out of, or relating to, this Contract or the breach thereof").

*broadly as possible*, and shall include any claim, dispute or controversy. . . *arising from or relating to this Agreement*[] [or] the credit offered or provided to you." R. at 148 (emphasis added); see Unison Co., 789 F.3d at 818-19 (finding clause broad where it covered "'any dispute' arising between the parties 'under or in connection with [the contract] or any legal relationship associated with or contemplated by [the contract]'").

B.

In applying a broad clause, we ask whether "the underlying factual allegations simply touch matters covered by the arbitration provision." Unison Co., 789 F.3d at 818 (internal quotation marks omitted). To answer this question, "[o]ur task is to look past the labels the parties attach to their claims to the underlying factual allegations and determine whether they fall within the scope of the arbitration clause." Amtex, 542 F.3d at 1199. Thus, we must begin with an analysis of the operative complaints.

Turning to a sample of the actual language used in the plaintiffs' claims,[5] this is what the plaintiffs allege with respect to the three groups of claims at issue on appeal:

---

[5]As stated, the quotations that follow are merely a sample of the scores of allegations in the complaints which rely on the same claims. Additionally, apart from the different language the respective states use to define their own laws, there is no meaningful difference in the factual allegations between the Parm complaint and the Arce/Osorio complaint. Indeed, in most instances, the same language is used. Compare, e.g., R. at 2 (allegation from the Parm complaint stating "Items sold on Fingerhut to low-income consumers come with substantial markups. . . . This massive sales price markup is actually a finance charge in disguise."), with R. at 76 (allegation from the Arce/Osorio complaint with almost identical language).

*Usury Allegations*

1. "As set forth more fully above, Defendant's prices are significantly marked up to mask the hidden interest charges. When those interest charges are considered, Defendant's loans carry an [sic] interest at a rate greater than 16% per annum in violation of [Georgia law]." R. at 16.

2. "Defendant charges an annual interest rate of approximately 24.90%. This annual interest rate is driven even higher when the hidden finance charges are accounted for. These rates of interest are far in excess of the maximum 10% annual interest allowed under Texas usury laws, 18% allowed under Florida usury laws, or 18% allowed under Minnesota usury laws." R. at 84.

*Unjust Enrichment Allegations*

1. "By means of Defendant's wrongful conduct alleged herein, it knowingly sold products at massively marked-up prices that disguised finance charges, [sic] and excessive interest." R. at 21, 113.

2. "Under the common law doctrine of unjust enrichment, it is inequitable for Defendant to be permitted to retain the benefits it received, and is still receiving, from the imposition of hidden finance charges and excessive interest on Plaintiff and members of the classes." R. at 21, 113.

*Truth-in-Lending/Consumer Protection Allegations*

1. "Adding insult to injury, Defendant charges another round of extremely high interest charges through the credit it arranges via its partners. Because the sales price is already inclusive of the hidden finance charge, Fingerhut is actually charging interest on interest, without disclosing this fact to consumers." R. at 9, 83.

2. "Defendant's wrongful conduct is likely to create a risk of confusion or misunderstanding including, by way of example and not limitation: Defendant's failure to disclose the hidden finance charge." R. at 20.

3. "As a result of the Defendant's conduct, Plaintiff and the Hidden Finance Charge Class members have suffered actual damages in that they paid a higher price to finance their purchases than was disclosed to them at the formation of the contract." R. at 20, 111.

4. "[California law] requires, at the time of opening the account, a creditor must make, [sic] a statement of when the charge begins to accrue and an explanation of whether or not any time period exists within which any credit that has been extended may be repaid without incurring the charge." R. at 96 (internal quotation marks omitted).

5. "As discussed above, Defendant charged more on Fingerhut—where consumers financed their purchases—then [sic] on Gettington—where they purchased them outright. This increased price was a charge assessed for the privilege of purchasing the goods in installments. Thus, this increased price became a finance charge." R. at 97, 98.

6. "Additionally, Defendant disclosed they would charge an APR of 21.65% plus the Prime Rate against the average daily balance. However, this disclosure does not include the finance charge assessed by Defendant at the outset of the purchase. Thus, the 21.65% + Prime Rate was inaccurate." R. at 99.

7. "In sum, nearly all of the goods sold on Fingerhut are available on Gettington for a significantly lower sales price. The markup on Fingerhut is actually a hidden finance charge. By not disclosing this finance charge, Defendant deceived consumers and violated the Truth in Lending Act [TILA] . . . ." R. at 10, 84.

8. "Pursuant to [federal law], Defendant is liable for violating the TILA by failing to disclose to Plaintiff and the Hidden Finance Charge Class members all finance charges . . . ." R. at 22, 109.

In sum, the plaintiffs' theory is that Bluestem is assessing a "hidden finance charge," which is evidenced by the higher price of goods on Fingerhut's platform as compared to Gettington. Thus, the argument goes, because (1) Fingerhut charges, for example, $100 more for a particular product than the same product featured on Gettington, and because (2) Fingerhut is already charging an exorbitant amount of interest to finance the purchase,[6] state usury and unjust enrichment laws are being violated, as are state and federal consumer protection laws. As shown by a review of the verbatim recitations from the plaintiffs' claims, the factual allegations underpinning every single claim "arise[] from" or "relate[] to" the financing agreements because, without those agreements, there could be no "hidden finance charge[s]." Indeed, there would be no financing at all, and this case would instead turn on whether someone paid cash for an overpriced item.

For example, according to the Arce/Osorio complaint, California law defines a "finance charge" as "the amount however denominated or expressed which the retail buyer contracts to pay or pays for the privilege of purchasing goods or services to be paid for by the buyer in installments." R. at 98. Therefore, if a consumer completed an outright cash purchase of an iPad for $100 more than the retail value, that $100 could no longer be a hidden "finance charge" under California law because there is no installment plan. This same analysis applies to the plaintiffs' federal claims under TILA because, as defined in that act, "['][f]inance charges' are 'the sum of all charges, payable directly or indirectly by the person to whom the credit is extended and imposed directly or indirectly by the creditor as an incident to the extension of credit.'" R. at 109 (quoting 15 U.S.C. § 1605(a)). Here again, without an "extension of credit," we are left with an overpriced item purchased with cash. Further,

---

[6]Significantly, Bluestem was the only party named as a defendant in the complaints. Thus, the myriad of allegations concerning "Defendant's loans" and the interest charged by "Defendant" are confusing because these phrases would be better directed at one of the banks providing the financing. Nonetheless, we simply deal with the allegations as pled in the complaint.

regarding the usury claims, every allegation starts with the 24.90% charged by the lender and adds to that amount the alleged hidden finance charge to equal an amount greater than that allowed by law in each of the respective states. And finally, the unjust enrichment claims depend on "the imposition of hidden finance charges and excessive interest." All of these allegations therefore "touch matters covered by the arbitration provision[s]." Unison Co., 789 F.3d at 818 (internal quotation marks omitted). Specifically, each claim implicates "the credit offered or provided to" the consumers because the facts underlying every claim overwhelmingly detail the financing relationship between the consumers and Bluestem.

Relying on the district court's reasoning, the appellees resist this outcome by asserting that their claims would persist even in the absence of the financing arrangements. But how can this be when the factual allegations underlying every single claim depend on the existence of the financing? Specifically, the appellees argue that the district court was correct in allowing their claims to proceed to the extent those claims involved only Bluestem's independent decision to charge a higher price for goods on Fingerhut. The actual allegations in their complaint, however, do not bear this out. The simple fact is that every single one of the plaintiffs used his or her line of credit to finance a purchase for an item from Fingerhut: one which they now claim is overpriced to mask a hidden finance charge built into the original financing each plaintiff secured from one of the banks. The *actual* allegations—regardless of how the plaintiffs now attempt to characterize them—therefore directly involve "the credit offered or provided to" the plaintiffs.

The appellees push on, insisting that Bluestem's interpretation would require arbitration of disputes concerning, for example, a car accident between a consumer and her neighbor or the third-party courier who delivers the packages, or a personal injury claim against Samsung where a consumer purchased an exploding cell phone from Fingerhut. The district court, too, engaged in this hypothetical exercise, positing that Bluestem's interpretation of the agreements would lead to arbitration of

a situation where a lender's employee sexually harassed another employee and the latter had a credit account subject to the agreement. The glaring issue with these hypotheticals is that they in no way inform the question before the court because we must "look . . . to the underlying factual allegations and determine whether they fall within the scope of the arbitration clause." Amtex, 542 F.3d at 1199. True, such an outcome would be bizarre, but we cannot comment one way or the other about whether the claims would be arbitrable without knowing the facts supporting each of the above illustrations.

The district court flipped the inquiry. The question is not whether there was a way to interpret the claims as falling outside the scope of the agreements; instead, where a valid arbitration agreement exists, the claims are arbitrable "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." Unison Co., 789 F.3d at 818 (internal quotation marks omitted); see also Leonard, 861 F.3d at 730 ("Doubts are resolved in favor of arbitration unless the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." (internal quotation marks omitted)); Amtex, 542 F.3d at 1199 ("Given the broad scope of the arbitration clause and our 'insist[ence] upon clarity before concluding that the parties did *not* want to arbitrate a related matter,' we conclude that it cannot be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers Amtex's claims." (quoting First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 945 (1995))).

The district court erred in deciding that these three groups of claims did not fall within the scope of the arbitration agreements.

### III.

Accordingly, we reverse the district court and remand for further proceedings consistent with this opinion.

_____