# IN THE COURT OF APPEALS OF IOWA

No. 21-1622
Filed October 5, 2022

TITAN PRO SCI, INC.,
    Plaintiff-Appellee,

vs.

ERIC MUFF, DAN FULTON and NEW AG BASICS, LLC,
    Defendants-Appellants.

_____

Appeal from the Iowa District Court for Hancock County, DeDra Schroeder, Judge.

The appellant-defendants challenge the district court's denial of their motion to compel arbitration. **AFFIRMED.**

Joseph G. Gamble of Duncan Green, P.C., Des Moines, for appellants.

Stephanie A. Koltookian and Martin J. Demoret of Faegre Drinker, Des Moines, for appellee.

Heard by Vaitheswaran, P.J., and Greer and Schumacher, JJ.

**GREER, Judge.**

In this multi-party litigation, we are asked if the substantive claims raised in the underlying proceedings fall outside the scope of arbitration clauses found in other agreements between some of the parties or whether the dispute touches a matter within the scope so that arbitration must be ordered. Starting with the dispute, Titan Pro SCI, Inc. (Titan) brought a lawsuit against former employees Dan Fulton and Eric Muff, who created New Ag Basics, LLC (collectively, the appellants).[1] Titan claimed the defendants breached confidentiality agreements they signed as part of their employment with Titan, misappropriated its confidential information, and engaged in tortious conduct. The appellants moved to compel arbitration, relying on arbitration provisions in both a purchase agreement and mutual general release between just Fulton and Titan. The district court denied the motion.

The appellants challenge the district court's denial of the motion to compel arbitration, arguing the court wrongly concluded Titan's claims against them do not fall within the scope of the two arbitration clauses. More specifically, they argue the district court improperly placed the burden on them to prove that the claims were suitable for arbitration—rather than placing the burden on Titan to prove the claims were not suitable; Titan's legal claims "touch on" matters covered by the broad arbitration provisions, which is enough to compel arbitration; and Muff and New Ag have a sufficiently close relationship to Fulton to enforce the arbitration

---

[1] We refer to Muff, Fulton, and New Ag Basics, LLC (New Ag) as the appellants to distinguish them from the larger group of defendants against whom Titan brought suit (who are still part of the substantive case) but who are not parties to this appeal because they did not move to compel arbitration.

provisions in agreements Fulton entered into with Titan. The appellants ask us to dismiss Titan's lawsuit with prejudice or, in the alternative, stay it pending arbitration. We affirm the district court's denial of the motion to compel arbitration and, with this decision, the lawsuit travels forward in the district court.

## I. Background Facts and Proceedings.[2]

Titan is a farm marketing organization that sells seed, chemicals, fertilizer, and insurance products to agricultural producers. Titan sells its products through a network of independent-contractor dealers, who participate in the promotion, marketing, and sale of the products in return for sales commissions. The network of dealers, which Titan maintains as a confidential list, consists of approximately 150 individuals across seven states.

Titan owns the products its customers buy; any sale occurs between Titan and the customer. The dealer facilitates the sale by communicating directly with the customers; entering orders for products into Titan's system; and receiving, storing, and sometimes delivering the product from Titan to the customers. According to Titan, it "makes a significant investment in its [d]ealerships, including through training, infrastructure, access to [Titan] services, access to [Titan's] [c]ustomer base, and resources that help the [d]ealers grow" the customer base. Titan gives dealers access to confidential and proprietary business information, including confidential price lists and customer lists, along with other sales information and data. The dealers enter into an "Independent Dealer Contract" with Titan, which includes pre- and post-termination restrictions on competition.

---

[2] Like the appellants, we rely on the pleadings in Titan's petition and amended petition to explain the history and procedure up to this point in the proceedings.

As part of the pre-termination restrictions, dealers are required to sell products exclusively on behalf of Titan unless another agreement explicitly allows otherwise. Additionally, dealers are prohibited from selling competing products to Titan's customers for a certain period of time after termination of the dealer's employment with Titan. To protect its confidential information, Titan applies a unique watermark for each dealer it sends confidential information—allowing it to determine the cause of a breach.

Titan also has a number of employees that assist with its business operations. At one point, Muff, Fulton, Samuel Bunk, and Richard Welsh were employees of Titan. As part of their employment, each signed a confidentiality agreement with Titan, promising to "not, during (except to perform my job duties for [Titan]) or at any time after my employment with [Titan], disclose or use [c]onfidential [i]nformation for [their] own or another's benefit." The agreement defined "confidential information" to include "information about [Titan's] customers, customer lists, pricing, costing, purchasing, profits, markets, products capabilities, business ventures, sales, sales histories, data processing, compensation, finances," and more. The agreement also contained a provision that the employees would—upon the termination of their employment—"immediately deliver to [Titan]" all of Titan's property, "including but not limited to all materials in my possession or control that contain [c]onfidential [i]nformation." The restrictions in the agreement "survive[d] the termination of [the employee's] employment," and the agreement could only "be cancelled, modified, or otherwise changed . . . by another written agreement signed by [the employee] and [Titan's] President/CEO."

In May 2016, Fulton purchased Midwest Agronomy, LLC (MWA) from Titan with a confidential purchase agreement. The agreement provided that Fulton was purchasing a corporate form and certain assets, liabilities, and property. This included a customer list, which was attached to the purchase agreement as "Exhibit E." The agreement provided that Fulton's, Muff's, and Bunk's employment with Titan would terminate with the sale of MWA, and those employees would be offered employment by MWA.

In October 2019, Titan brought suit against Welsh, who worked as an employee of Titan from 2009 to 2017 selling agriculture insurance. Titan alleged that immediately before Welsh's employment was terminated in September 2017, Welsh "improperly extracted significant amounts of [c]onfidential [i]nformation from" Titan, including attempting to download a file with nearly a decade of information about Titan's customers and sales and a 2017 spreadsheet listing all of Titan's 2017 crop insurance customers, which he then sent to his personal email. Titan claimed Welsh organized CAVER Corporation, which does business as Premier Crop Services, Inc. (Premier), to sell competing agricultural input products to both Titan's dealers and customers and that Welsh used the confidential information he took from Titan "to intentionally target [Titan's] [d]ealers" and "solicit [them] to breach their contracts with" Titan to provide Welsh and Premier access to those customers. Titan brought claims that Welsh breached his confidentiality agreement; Welsh and Premier tortiously interfered with Titan's independent dealer contract with at least one specific dealer; Welsh and Premier tortiously interfered with Titan's prospective business relationships with customers;

and Welsh and Premier were unjustly enriched through improper use of confidential information.

Welsh and Premier answered, and the two sides agreed to a trial scheduling and discovery plan. Based on information learned while conducting discovery, in April 2021 Titan moved to amend its petition at law. Titan wished to add new parties—Bunk, Muff, Fulton, and New Ag—and claims, including a claim of civil conspiracy.

In the amended petition, Titan alleged that Fulton, Muff, and Bunk were former employees of Titan's who (like Welsh) regularly communicated with Titan's dealers as part of their employment. As laid out in the purchase agreement, the trio left Titan to operate the competing business MWA on May 18, 2016. But, Titan alleged, since August or September 2017, Fulton, Muff, and Bunk "worked in concert [with Welsh] to develop a system to target" Titan's dealers and customers "and misappropriate [c]onfidential [i]nformation of [Titan's] to provide [d]efendants an improper competitive advantage." Titan claimed the individual defendants and Premier organized a system to sell competing agricultural input products to Titan's dealers and customers, of which Welsh's 2017 extraction of confidential information from Titan was "part of [the] concerted plan." According to Titan, each of the individual defendants aided, assisted, and were directly involved in Welsh and Premier's actions of soliciting, selling, and distributing agricultural products to Titan's dealers and customers. In doing so, the defendants targeted Titan's dealers to breach their pre- and post-termination contracts with Titan. The individual defendants requested and obtained confidential information from dealers, such as Titan's price list, which the defendants then used to undercut

Titan's pricing. Titan asserted that Muff and Fulton created New Ag to sell competing agricultural input products, which it continued to do through Welsh and Premier. In the amended petition, Titan claimed that each individual defendant breached their confidentiality agreement with Titan and all defendants tortiously interfered with Titan's contracts with dealers, including but not limited to a dealer who, in a separate proceeding in federal court, admitted he violated his non-compete and so agreed to stop his business and to pay Titan damages for the violations. Additionally, all defendants tortiously interfered with Titan's prospective business relationships with customers by targeting Titan's dealers and encouraging them to breach their contracts by giving the defendants access to Titan's customers, and all defendants engaged in a civil conspiracy against Titan. Titan maintained that, due to their actions, all defendants were unjustly enriched at Titan's expense.

Welsh and Premier resisted Titan's request to amend its petition, but on May 4, 2021, the district court allowed Titan to amend.

Then in August, the appellants moved to compel arbitration. They asserted that Titan's claims were subject to binding arbitration agreements and asked the district court to either dismiss Titan's lawsuit with prejudice or, in the alternative, stay the lawsuit pending the completion of arbitration. More specifically, the appellants admitted that Muff and Fulton signed confidentiality agreements with Titan as part of their employment but claimed the issue was controlled by the confidential purchase agreement Fulton entered into with Titan in 2016, which "expressly allowed Fulton and MWA, and all [appellants] as MWA employees, to compete with Titan." (Citation omitted.) The appellants also relied on a mutual

general release that Fulton and Titan signed in 2017, claiming the parties "released all claims against each other arising out of or in any way related to the [c]onfidential [p]urchase [a]greement."[3] Both the purchase agreement and the mutual general release contain arbitration provisions, which state in part: "The parties agree to resolve any claims relating to the Agreement through final and binding arbitration." To access the arbitration process, the appellants claimed they "intend[ed] to show that if they used any confidential information, it was the confidential information Fulton purchased from [Titan] pursuant to the" purchase agreement so—according to the appellants—Titan was required to submit to arbitration. Although the appellants recognized only Fulton signed the agreements containing the arbitration provisions, they argued Muff and New Ag had a "sufficiently close" relationship to Fulton to compel arbitration as to them as well.

---

[3] The release provides that:

each party hereby forever generally and completely releases and discharges the other party, *except for the Confidentiality Agreements attached* (Exhibit A-1 with Sam Bunk, Exhibit A-2 with Dan Fulton, Exhibit A-3 with Eric Muff), and its servants, agents, directors, officers and employees, and all others, of and from any and all claims and demands of every kind and nature, in law, equity or otherwise, known and unknown, suspected and unsuspected, disclosed and undisclosed, for damages actual and consequential, past, present and future, *arising out of or in any way related to* (a) that certain Confidential Purchase Agreement between the parties dated effective May 18, 2016 (the "Purchase Agreement") including the MWA payment obligation of $500,000 under Section 1(b)b of the Purchase Agreement, (b) obligations as to rebates for the 2016 growing season payable by any party to the other, (c) product returns or re-evaluations, and (d) obligations of any of the parties with respect to accounts payable and accounts receivable. Notwithstanding the foregoing, the release contained in this paragraph *does not release, discharge, amend or modify the obligations, rights and responsibilities of the parties under Sections 2 through 13 of the Purchase Agreement.*

(Emphasis added.)

Titan resisted arbitration, arguing its lawsuit was premised on the theory that Welsh used Titan's confidential information to improperly undercut Titan's position in the marketplace by selling products sourced through Muff, Fulton, and Bunk. Titan claimed it would prove that Welsh sold more than $2 million in competing products from September 2017 through May 2021 to at least eight current or former Titan dealers—none of whom were included in the customer list that was part of Fulton's purchase of MWA. Pointing to "Exhibit E," the list of customers attached to the purchase agreement, Titan asserted that the "scope of the [d]ealers and [c]ustomers at issue [was] defined by the customer list [d]efendants Welsh and Premier have produced in this case" and asked the court to compare the customers Welsh and Premier listed in response to supplemental interrogatories with the list of customers Fulton purchased as part of MWA.

In a supplemental brief, the appellants took another approach and claimed "that all obligations under those 2014 [c]onfidentiality [a]greements were released in the May 18, 2016" purchase agreement. The appellants cited to section 4 of the purchase agreement, which contains the "general release" of the agreement and states:

> **General Release**. Seller hereby releases, compromises and discharges and holds harmless the Company, Buyer and its and their respective affiliates, and each of their respective shareholders, members, partners, managers, directors, officers, actual or potential debt or equity funding sources, employees, successors, attorneys, representatives and assigns (the "Company Released Parties") from and against any and all liabilities, claims, causes of action, damages, costs, obligations or liabilities and all expenses (including, without limitation, attorneys' fees) of any type or description, whether known or unknown, accrued or un-accrued, asserted or un-asserted (any of the foregoing, a "Claim"), arising out of or related to any actions of the Company Released Parties prior to the date of this Agreement, but excluding any Claims based on fraud of any Company Released

Party or any Claims by Seller arising out of or relating to this Agreement (including, without limitation, in connection with a breach of a representation or warranty of Buyer contained herein).

Additionally, the appellants relied on section 8 of the purchase agreement, claiming it established that the purchase agreement "supersedes all prior agreements between the parties." That section states:

**Entire Agreement and Modification**. This Agreement constitutes the entire agreement between the parties with respect to the subject matter of this Agreement and supersedes any prior agreement between or among the parties with respect to the subject matter hereof. This Agreement shall not be modified or amended in any manner other than by the written agreement of all of the parties hereto.

Finally, the appellants cited to paragraph (*l*) of section 1, which provides, "**No Restriction**. Nothing contained in this Agreement will restrict either Party from competing one with the other, in Nebraska or otherwise."

Titan submitted a reply brief, arguing the appellants' contention that the 2016 purchase agreement released them from their confidentiality agreements was "plainly incorrect," as the release stated it was limited to claims "arising out of or related to any actions of the Company Released Parties *prior to the date of this [a]greement*" and Titan's claims involved alleged actions from 2017 onward. (Emphasis added.) Moreover, the "release" was from "liabilities, claims, causes of actions, damages, costs, obligations or liabilities and all expenses"—not from a previous agreement. And Titan emphasized only Fulton was a party to the purchase agreement. As for the integration clause, it did not apply to supersede the confidentiality agreements because it was limited to "the subject matter of [the purchase] Agreement." Plus, according to Titan, the express terms of the 2017 mutual general release between Fulton and Titan make it clear the confidentiality

agreements survived the 2016 purchase agreement, as the 2017 general release references the confidentiality agreements and explicitly excludes them from the release: "It is understood and agreed that except as expressly provided in the second sentence of the preceding paragraph or in the [c]onfidentiality [a]greement attached, this is a full, complete, and final general release of any and all claims described as aforesaid . . . ." (Citation omitted.)

Following a September 2021 hearing, the district court denied the appellants' motion to compel arbitration. The court concluded the purchase agreement did not release the appellants from their confidentiality agreements and Titan's legal claims did not relate to the substantive information it sold Fulton in the purchase agreement. So Titan's claims against the appellants were not related to the purchase agreement, which contained the arbitration clause upon which the appellants relied. As the district court put it:

> The crux of [Titan's] grievances are that Defendant Welsh breached his confidentiality agreement with [Titan] by conspiring with [the appellants], who then consequently also breached their confidentiality agreements. . . . [Titan] does not allege that the [p]urchase [a]greement has been violated and does not seek to enforce the terms of the [p]urchase [a]greement.

Additionally, the mutual release—which also contained a valid arbitration provision—did not incorporate by reference the confidentiality agreements, so a claim the confidentiality agreements were breached did not trigger the arbitration provision in the release.

The appellants appeal.[4]

---

[4] "The *denial* of a motion to compel arbitration is a final judgment for purposes of appeal." *Heaberline Farms, Inc. v. IGF Ins. Co.*, 641 N.W.2d 816, 817 (Iowa 2002) (emphasis added).

**II. Standard of Review.**

The parties agree the Federal Arbitration Act (FAA) governs the written arbitration agreements.[5]  *See ING Fin. Partners v. Johansen*, 446 F.3d 777, 779 (8th Cir. 2006) ("[T]he construction of an agreement to arbitrate is governed by the [FAA] unless an agreement expressly provides that state law should govern."); *see also* 9 U.S.C. § 2.  So "[w]e review *de novo* the district court's interpretation of the contract provision[s] regarding arbitration."  *Kelly v. Golden*, 352 F.3d 344, 349 (8th Cir. 2003).  "To the extent the district court's ruling on arbitration is based on factual findings, we review those findings for clear error."  *Duncan v. Int'l Mkts. Live, Inc.*, 20 F.4th 400, 402 (8th Cir. 2021).

**III. Discussion.**

**A. Motion to Compel Arbitration: General Principles.**

The FAA "reflects 'a liberal federal policy favoring arbitration.'"  *Zetor N. Am., Inc. v. Rozeboom*, 861 F.3d 807, 810 (8th Cir. 2017) (quoting *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 319 (2011)).  But as a matter of contract, "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Id.* (citation omitted).  "The FAA does not mandate arbitration per se; it mandates that arbitration agreements be enforced."  *Rent-A-Center, Inc. v. Iowa Civ. Rts. Comm'n*, 843 N.W.2d 727, 741 (Iowa 2014).  That means the court can "order arbitration of a particular dispute only where the court is satisfied that the parties agreed to arbitrate *that dispute*."  *Granite Rock Co. v. International*

---

[5] If our state arbitration act controlled, we would review for correction of errors at law.  *See Gen. Conf. of Evangelical Methodist Church v. Faith Evangelical Methodist Church*, 809 N.W.2d 117, 120 (Iowa Ct. App. 2011).

*Brotherhood of Teamsters*, 561 U.S. 287, 297 (2010). Therefore, "[a] court's role under the FAA is . . . limited to determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute." *Pro Tech Indus., Inc. v. URS Corp.*, 377 F.3d 868, 871 (8th Cir. 2004); *accord Medcam, Inc. v. MCNC*, 414 F.3d 972, 975 (8th Cir. 2005) (providing that the court "asks only whether the parties have agreed to arbitrate a particular claim and does not reach the potential merits of the claim"). "By its terms, the FAA 'leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed.'" *Pro Tech Indus.*, 377 F.3d at 871 (citation omitted).

In considering the motion to compel arbitration, "the [c]ourt is free to consider materials beyond the pleadings." *Brondyke v. Bridgepoint Educ., Inc.*, 985 F. Supp. 2d 1079, 1089–90 (S.D. Iowa 2013) (citation omitted), *accord id.* at 1090 n.4 ("Eighth Circuit law . . . specifies that in ruling on a motion to compel arbitration, a court must conduct a limited review of the arbitration provision, and thus necessarily anticipates consideration of documents that may lay outside the pleadings."). "When parties submit affidavits in conjunction with the motion to compel arbitration, the district court treats the motion akin to a motion for summary judgment, viewing the record in the light most favorable to the nonmovant."[6]

---

[6] The appellants maintain Titan has the burden to prove its claims do not fall within the arbitration provisions, relying on *Green Tree Financial Corp.-Alabama v. Randolph*, 531 U.S. 79 (2000). But in *Green Tree*, the dispute centered on a party who had agreed to submit to arbitration attempting to invalidate the arbitration agreement on the ground that arbitration would be prohibitively expensive to her. 531 U.S. at 89–92. The Supreme Court ruled, "[W]e believe that where, as here,

*Duncan*, 20 F.4th at 403; *accord Nebraska Mach. Co. v. Cargotec Sols., LLC*, 762 F.3d 737, 742 (8th Cir. 2014) ("Given that both parties relied on matters outside the pleadings and sought summary judgment-type rulings, a summary judgment standard—viewing the evidence and resolving all factual disputes in the nonmoving party's favor—should have been used to evaluate the motions."). That said, "[t]he question is not whether there was a way to interpret the claims as falling outside the scope of the agreements." *Parm v. Bluestem Brands, Inc.*, 898 F.3d 869, 878 (8th Cir. 2018). "[I]nstead, where a valid arbitration agreement exists, the claims are arbitrable 'unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.'" *Id.* (quoting *Unison Co. v. Juhl Energy Dev., Inc.*, 789 F.3d 816, 818 (8th Cir. 2015)).

If there are genuine issues of material fact that must be decided to determine whether arbitration should take place for this specific dispute, then there needs to be a trial to determine those facts. *See Howard v. Ferrellgas Partners, L.P.*, 748 F.3d 975, 977–80 (10th Cir. 2014) (providing that under the FAA, the district court must "proceed summarily to the trial" of relevant facts "[w]hen . . . a quick look at the case suggests material disputes of fact *do* exist on the question whether the parties agreed to arbitrate[;] round after round of discovery and motions practice isn't the answer"); *see also Foster v. Walmart, Inc.*, 15 F.4th 860, 864–65 (8th Cir. 2021). "Without factual findings about . . . whose story to

---

a party seeks to invalidate an arbitration agreement on the ground that arbitration would be prohibitively expensive, that party bears the burden of showing the likelihood of incurring such costs." *Id.* at 92. That is not the issue in this case.

credit . . . , we don't know whether the parties agreed to arbitrate a dispute like this one."  *Howard*, 748 F.3d at 979.  At such a trial—as opposed to the typical proceeding on the motion to compel arbitration—"the court must lift that thumb from the scales, evaluate the conflicting evidence even-handedly, and decide which side's account is more likely true."  *Id.* at 980.

### B. The Appellant's Motion to Compel Arbitration.

As previously stated, our role is "limited to determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute."  *Pro Tech Indus.*, 377 F.3d at 871.  If the answer to both of those questions is yes, we order the parties to submit their disputes to arbitration.  Here, as in the district court, the parties do not dispute that both the purchase agreement and the mutual general release include valid agreements to arbitrate.  So we proceed to consider whether those agreements encompass the disputes at issue.

We start by considering how broadly or narrowly the arbitration clauses involved are written.  *See United Steelworkers of Am., AFL-CIO-CLC v. Duluth Clinic, Ltd.*, 413 F.3d 786, 788 (8th Cir. 2005) ("This court first decides whether the arbitration clause is narrow or broad.").  "Arbitration clauses covering claims 'arising out of' or 'relating to' an agreement are broad."  *Zetor*, 861 F.3d at 810. "[W]ith a broad arbitration clause[, we] 'send a claim to arbitration as long as the underlying factual allegations simply touch matters covered by the arbitration provision.'"  *Id.* (citation omitted).  In other words, even "collateral disputes that relate to the agreement containing the clause" are arbitrable when the arbitration provisions are broad.  *Parm*, 898 F.3d at 874 (citation omitted).

The valid arbitration provisions in the purchase agreement and the mutual release are identical, stating, "The parties agree to resolve *any claims relating to the Agreement* through final and binding arbitration." (Emphasis added.) These are broad provisions. *See, e.g.*, *id.* (providing that arbitration clauses covering claims "relating to" an agreement "constitutes the broadest language the parties could reasonably use to subject their disputes" to arbitration (citation omitted)). But concluding the provisions are broad does not answer the ultimate question— whether those broad arbitration agreements encompass the disputes Titan actually raised.

Titan sued the appellants for the following: (1) breach of contract (Muff & Fulton); (2) tortious interference with a contract (all appellants); (3) tortious interference with prospective business relationships (all appellants); (4) civil conspiracy (all appellants); and (5) unjust enrichment (all appellants). "Under the [FAA], we generally construe broad language in a contractual arbitration provision to include tort claims arising from the contractual relationship, and we compel arbitration of such claims." *Hudson v. ConAgra Poultry Co.*, 484 F.3d 496, 499–500 (8th Cir. 2007). In deciding whether each particular dispute falls within the arbitration agreements, "[o]ur task is to look past the labels the parties attach to their claims to the underlying factual allegations and determine whether they fall within the scope of the arbitration clause." *3M Co. v. Amtex Sec., Inc.*, 542 F.3d 1193, 1199 (8th Cir. 2008).

So, how does Titan's claim over appellants' breach of the confidentiality agreement "relate to" or "touch upon" the purchase agreement, mutual general release, or both (as the agreements that contain the arbitration provisions)? The

appellants contend there are "interconnections of the parties' agreements" because the purchase agreement "is a defense" to Titan's claim they breached the confidentiality agreement. We conclude these issues can be properly decided in a motion-to-compel-arbitration setting as opposed to a factual dispute review requiring a trial. *See Howard*, 748 F.3d at 977–80; *see also Pillsbury Co. v. Wells Dairy, Inc.*, 752 N.W.2d 430, 435–36 (Iowa 2008) ("[C]onstruction of a contract is the process a court uses to determine the legal effect of the words used. We always review the construction of a contract as a legal issue." (internal citation omitted)).

First, the appellants broadly contend that Titan's allegations they breached their respective confidentiality agreements "are rebutted by the express terms of the [p]urchase agreement, which specifically provides for employment of the [i]ndividual [d]efendants by MWA and expressly allows MWA and its employees to compete with" Titan. The appellants' argument misses the mark. Even assuming the section (1), paragraph (i) of the purchase agreement—which provides that Fulton and Muff will stop working for Titan and will begin working for MWA—and section (1), paragraph (k)—which says, "Nothing contained in this Agreement will restrict either Party from competing one with the other, in Nebraska or otherwise"—combine to "expressly allow" Fulton and Muff to compete with Titan, being allowed to compete is not necessarily the same thing as being allowed to use and disclose confidential information. And the confidentiality agreement Fulton and Muff signed did not preclude them from competing with Titan; it prevented them from using or disclosing Titan's confidential information. Put another way, nothing in the confidentiality agreement restricted Fulton and Muff from starting their own

company and engaging in the same type of sales and services as Titan, so the purchase agreement's provisions allowing them to do so did not necessarily contradict or undo the confidentiality agreement. This reading is supported by the "No Restriction" provision of the purchase agreement, which stated that "[n]othing contained *in this [a]greement* will restrict either party from competing"—leaving open the possibility that some other agreement may provide some restriction. (Emphasis added.)

Second, the appellants claim that the assets Fulton purchased from Titan are "the same as the confidential information as defined in the confidentiality agreements between [Titan]" and them. The purchase agreement provides the complete list of assets Fulton purchased from Titan; he bought the shell company of MWA and its interests in the company's Agricultural Commodity Purchasing Power plus the following:

> (A) the inventory identified on Exhibit A ("Purchased Inventory"), (B) the personal property and intangible assets (trade names, trade secrets, website domain name) identified on Exhibit B, (C) the accounts receivable (after all unapplied cash and prepay amounts are applied to open invoices on each accounts receivable account) identified on Exhibit C (the "Accounts Receivable"), and (D) the customer list attached as Exhibit E, in all cases free and clear of all liens, claims, options to sell or purchase, security interests, mortgages, pledges, restrictions or encumbrances of any kind.

The agreement does not broadly include any and all "confidential information" of Titan's—it includes a list of specific customers as provided in exhibit E. And Titan's lawsuit does not touch upon the customers whom MWA purchased.[7] The fact that

---

[7] Titan's petition and amended petition do not include lists of specific dealers or customers it alleges the defendants improperly targeted, and Titan did not explicitly exclude the customers from Exhibit E of the purchase agreement from being at issue in the suit. But in later filings with the district court and at the hearing on the

Fulton purchased a subset of confidential information from Titan does not give MWA and its employees free rein to use or disclose any and all of Titan's confidential information.

And finally, the appellants claim that the mutual general release is "touched by" the claim they breached their confidentiality agreements because the mutual release "provides that Fulton, MWA, and Titan Pro released each other and each other's employees from all claims for past, present and future damages, arising out of or in any way related to the Purchase Agreement." This is an attempt to bootstrap the mutual release to the disputes by its connection to the purchase agreement, but—as we have already decided the purchase agreement is not a defense to and does not cover Titan's breach-of-contract claim against the appellants—the mutual release's relation to the purchase agreement does not make it pertinent to the dispute at issue.

---

motion to compel, Titan took the position that its lawsuit was limited to those customers Welsh and Premier listed in their supplemental answer to interrogatory 8. As the district court did, we have confirmed that those customers are not included in the list of customers Fulton purchased. Importantly, we base our conclusion that Titan's lawsuit does not relate to any substantive information it sold Fulton in 2016—and therefore the dispute does not "touch upon" the purchase agreement—on Titan's later representations. Titan may not take a different, adverse position on this issue in the future. *See State v. Duncan*, 710 N.W.2d 34, 43 (Iowa 2006) ("A party who has, with knowledge of the facts, assumed a particular position in judicial proceedings is estopped to assume a position inconsistent therewith to the prejudice of the adverse party." (citation omitted)); *Wilson v. Liberty Mut. Grp.*, 666 N.W.2d 163, 166 (Iowa 2003) (describing judicial estoppel as "a 'common sense' rule, designed to protect the integrity of the judicial process by preventing deliberately inconsistent—and potentially misleading— assertions from being successfully urged in succeeding tribunals"); *see also Gray v. City of Valley Park, Mo.*, 567 F.3d 976, 981 (8th Cir. 2009) (recognizing the doctrine of judicial estoppel and its purpose).

The appellants do not offer a separate, specific argument as to how the factual allegations supporting Titan's tort claims touch on matters covered by the arbitration provisions in the purchase agreement and mutual general release. While we read the arbitration provisions broadly, we reiterate that we "may order arbitration of a particular dispute only where the court is satisfied that the parties agreed to arbitrate *that dispute*." *Granite Rock*, 561 U.S. at 297. And we do not start with the presumption that the dispute falls within the parties' agreement to arbitrate. *Cf. id.* at 301 (providing that we only apply the presumption of arbitrability "where a validly formed and enforceable arbitration agreement is ambiguous about whether it covers the dispute at hand"). Here, the arbitration clauses in the purchase agreement and mutual general release are not susceptible to an interpretation that covers Titan's claims under breach-of-contract or any tort theories. Therefore, we agree with the district court's denial of the appellants' motion to compel arbitration.[8]

**AFFIRMED.**

---

[8] Because we conclude the agreements signed by Fulton do not require Titan to arbitrate its claims, we need not determine whether Muff and New Ag have a sufficiently close relationship to Fulton to also enforce the arbitration provisions against Titan. *See, e.g.*, *CD Partners, LLC v. Grizzle*, 424 F.3d 795, 798 (8th Cir. 2005) (allowing a nonsignatory to enforce an arbitration clause against a signatory when "the relationship between the signatory and nonsignatory defendants is sufficiently close that only by permitting the nonsignatory to invoke arbitration may evisceration of the underlying arbitration agreement between the signatories be avoided" (citation omitted)).